# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ) | |
| RONARD PARKER, ) | |
|             Petitioner, ) | |
| ) | Case No. 04 C 5147 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| MARC HODGE, Warden, ) | |
| ) | |
|             Respondent. ) | |

## MEMORANDUM OPINION & ORDER

After a bench trial, Petitioner Ronard Parker was convicted and sentenced to concurrent terms of fifteen years for aggravated kidnapping, thirty-five years for heinous battery, and thirty-five years for attempted murder. The charges stem from an attack that took place on July 2, 1995, when Wilbur Upshaw was beaten and locked in the trunk of a car with an M-80 explosive device. Parker now challenges his conviction pursuant to 28 U.S.C. § 2254.[1] For the reasons set forth below, the court denies the petition.

### I. BACKGROUND[2]

At trial, Wilbur Upshaw testified as follows. Although they were not friends, Upshaw had known Parker for about nine months by the nickname "Assassin," and Parker had recently given Upshaw his car to repair. Between 6 p.m. and 7 p.m. on July 2,

---

[1] The court substitutes the current warden of Lawrence Correctional Center as the proper party respondent pursuant to Rule 2(a) of the Rules Governing Habeas Corpus Cases under 28 U.S.C. § 2254 and Fed. R. Civ. P. 25(d)(1).

[2] The court takes most of its facts from the Illinois Appellate Court's recitation in *People v. Parker*, 724 N.E.2d 203 (Ill. App. Ct. 1999). *See Morgan v. Hardy*, 662 F.3d 790, 797-98 (7th Cir. 2011) ("We presume state factual findings to be correct, unless the petitioner rebuts the presumption by clear and convincing evidence. The presumption of correctness also applies to factual findings made by a state court of review based on the trial record.") (citations omitted). Additional uncontroverted facts from the record are also included where helpful.

1995, Upshaw was walking near a tire shop where he worked as a mechanic. Parker pulled up in a van along with some other people. Parker asked Upshaw if he was called "Peanut." When Upshaw said "yes," Parker called out to his companions, "Here he is here." Parker asked where his car and his money were. Upshaw told Parker that he had taken the car to a shop at 16th and Michigan for repairs; he volunteered to call the mechanic who was working on Parker's car. Parker responded, "No. We're not going to do this. You're going with me."

Upshaw said he was not going anywhere. Parker and his cohorts then grabbed Upshaw and forced him into the van. Upshaw's shirt was ripped off, and someone kicked Upshaw, fracturing his jaw. Parker sat on Upshaw with one hand holding a screwdriver and the other hand around Upshaw's neck, threatening to stab Upshaw with the screwdriver if he moved.

The van drove to the parking lot of a Chicago Housing Authority ("CHA") building located at 41st and Federal Street in Chicago. Upshaw testified that he knew Parker frequented that building because Upshaw had a girlfriend who lived in the area, and he would see Parker when he went to visit her. At the parking lot, Upshaw was forced out of the van; unidentified people took Upshaw's shoes and threw them onto the railroad tracks. When a CHA police car drove by, Parker made Upshaw hide, threatening to kill him if he made any noise.

Shortly thereafter, two of Parker's eventual co-defendants, Michael Green and Russell Young (collectively with Parker, "the defendants"), arrived. Parker said that he needed a car to put Upshaw in and asked Green and Young to get the keys to a car from the building across the street. When Young could not find a tire iron, he grabbed a

2

baseball bat instead; Upshaw was hit with the bat on the way to the building. They found the keys about ten minutes later, then went back across the street. Upshaw was hit with the bat again on the way back.

Young and Parker opened the trunk of a gray, four-door Chevrolet car and put Upshaw inside. They shut the lid and told Upshaw that if he made any noise they would shoot up the trunk. Parker ordered someone to shoot if Upshaw made noise. After twenty to thirty minutes, Parker reopened the trunk. Green and Young were there. Upshaw was ordered to face away from the attackers, and Young told him that if he looked around Young would hit him with the bat. Upshaw heard someone say that they were going to "blow up his butt." He attempted to turn around and was hit with the bat.

Someone put an M-80 down the back of Upshaw's pants and closed the trunk of the car. Upshaw tried to remove the M-80, but it exploded in his hand, blowing off three of his fingers. The trunk flew open. Upshaw screamed that they had "messed up his hand," whereupon some of his assailants began to laugh. Parker and Green then told him to get out and "run toward 41st Street and don't stop." As Upshaw ran away, other people threw stones at him. His clothes were on fire and fell off him as he fled.

Upshaw found help nearby; someone called an ambulance and the police. He was taken to Cook County Hospital, where he remained for over two months. When Upshaw was admitted to the hospital, cocaine was found in his system. Upshaw denied using cocaine on the date of the attack, but admitted that he had used cocaine two days earlier.

At trial, the parties stipulated that the treating doctor at the hospital would testify that Upshaw's injuries included three missing fingers; a broken jaw; broken facial bones; burns to the buttocks, both hands, and the lower back; and numerous abrasions and

bruises. Upshaw required significant surgery, including having his rectum repaired and having muscle transplanted from his shoulder to his hand. It was also stipulated that a forensic expert would testify that the injury to Upshaw's hand was caused by a flammable device known as an M-80 to an M-1000.

Chicago police officer Eugene Offet testified that he and two other officers were called to 4227 South State Street at about 11:15 p.m. Upshaw was there being treated by paramedics. Later, in the emergency room, Upshaw related his version of the events. According to Officer Offet, Upshaw provided the nicknames of four of the people that attacked him: "Assassin," "Black Mike," "Rell" and "Russ." Officer Offet knew people with those nicknames who hung around the building at 41st and Federal. The next day, Officer Offet went to that building and found the defendants along with others (including Green's brother, whose nickname is "Rell"), and arrested them all. Officer Offet located a gray, four-door car and saw that the trunk lid had been blown open. There were bloodstains near the car, burned bloody clothing inside the trunk, and more clothing fifteen to thirty feet away from the car. The car had a "for sale" sign in the window; the sign also had "2000 Assassin 20039" written on it.

At the police station, Parker allegedly told Officer Offet that "they had gotten into it with this guy Wilbur about some money he owed them, and he refused to pay up." He realized the situation had gotten out of control when he saw the extent of Upshaw's injuries. The arrestees had their photographs taken at the station, and Upshaw picked the defendants from the photo array. (The prosecution could not produce these photos at trial.) The others were permitted to leave. On cross-examination, Upshaw testified that although he had identified the defendants from their photographs, he could not have

given Officer Offet the nicknames for Green and Young, because he did not know them. He thought that he told Offet that one of the attackers was named "Assassin" and that one had braids (as Young did).

Detective John Griffin testified that when he talked with the defendants at the police station on July 3, 1995, each defendant admitted being a member of a street gang called the Gangster Disciples. Young did not provide any additional information, but Parker said he was a coordinator for the gang. He said that he knew "Peanut," but denied any knowledge of the incident. Green also professed ignorance.

Barbara White testified that on July 2, 1995, she was working as a security guard at the building on 41st and Federal. White knew Parker by sight, but she stated that on the night of the attack, the only thing unusual that she observed was a naked man run through the parking lot. Her partner called the police when they saw the man run past. On cross-examination and over objection, White said she knew that Gangster Disciples hung around the building. In closing argument, the prosecutor suggested that White had testified untruthfully out of fear of the Gangster Disciples. The trial court overruled a defense objection to that argument.

The trial judge held a bench trial, with the defendants receiving simultaneous but severed bench trials. The trial court found the defendants guilty on all counts. Parker and Young were each sentenced to an extended term of thirty-five years on the charge of attempted murder, which was to run concurrently with a thirty-five year sentence for heinous battery and a fifteen year sentence for aggravated kidnapping; Green received twenty-five years for attempted murder, which was to run concurrently with twenty-five

years for heinous battery and fifteen years for aggravated kidnapping. All other counts were merged.

On direct appeal, Parker argued that (1) the prosecution did not prove that the defendants intended to kill Upshaw, since they allowed Upshaw to leave the area after the incident; and (2) the trial court erred by allowing the introduction of gang evidence, since the crime was not gang related. Green and Young joined these arguments and raised some additional issues. The appellate court reversed Green's convictions, but affirmed all three of Parker's convictions (as well as most of Young's). The appellate court concluded there was "ampl[e] evidence to support an inference that Mr. Parker and Mr. Young intended to kill Mr. Upshaw," and that although the trial court erred in failing to sustain Parker's objections to the gang testimony, the error was harmless in light of the "overwhelming evidence" of Parker's guilt. *Parker*, 724 N.E.2d at 211-12.

That decision issued on December 30, 1999, and Parker filed a *pro se* petition for leave to appeal ("PLA") to the Illinois Supreme Court on March 9, 2000. In the PLA, he set out the same two arguments that he had made to the appellate court as "points relied upon for reversal," and further stated that he was relying upon and incorporating by reference the arguments set out in his appellate court briefing. The PLA was denied on May 31, 2000. *See People v. Parker*, 731 N.E.2d 769 (Ill. 2000).

Next, Parker filed a *pro se* petition for post-conviction relief on November 2, 2000. There, he argued that his trial and appellate counsel were ineffective, that prosecutorial misconduct denied him due process of law, that his sentence was unconstitutional under *Apprendi vs. New Jersey*, 530 U.S. 466 (2000). The trial court summarily denied the petition on December 19, 2000. Parker, represented by counsel,

filed a notice of appeal on January 13, 2000. The appeal presented the limited issue of whether Parker's extended-term sentence was unconstitutional under *Apprendi*. The appellate court affirmed the trial court, *see People v. Parker*, 835 N.E.2d 467 (Ill. App. Ct. 2002), and Parker filed a PLA, which was denied on October 7, 2003, *see People v. Parker*, 803 N.E.2d 494 (Ill. 2003). Parker then filed a petition for writ of *certiorari* to the U.S. Supreme Court, which was also denied. *See Parker v. Illinois*, 541 U.S. 962 (2004).

Parker followed up by filing his initial *pro se* petition for a writ of habeas corpus in this court. The court appointed counsel, who drafted an amended petition. Parker's amended petition presents two issues. First, he argues that the trial court erred in allowing argument regarding gang-related evidence, and that the appellate court unreasonably applied clearly established federal law when it concluded that the error was harmless. Second, he argues that the ineffective assistance of his trial counsel requires the automatic reversal of his convictions for attempted murder and heinous battery. Notably, Parker is not challenging his kidnapping conviction. This court addresses each issue in turn.

## II. LEGAL STANDARD

As the Supreme Court has repeatedly emphasized, "a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011) (quoting *Wilson v. Corcoran*, 131 S.Ct. 13, 15 (2010)); *see Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), further narrows a

reviewing court's inquiry. Under the AEDPA, once a petitioner's claim is "adjudicated on the merits in State court proceedings," a federal court can grant relief only where the challenged state court decision is "contrary to" or "an unreasonable application of" clearly established federal law as determined by the Supreme Court of the United States. *See Greene v. Fisher*, 132 S.Ct. 38, 42 (2011); *Cheeks v. Gaetz*, 571 F.3d 680, 684-85 (7th Cir. 2009). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision involves an "unreasonable application" of clearly established federal law where the court unreasonably applied the controlling legal rule to the facts of the case. *Id.* at 407. The state court's application of Supreme Court precedent must be more than incorrect or erroneous, it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 65 (2003).

Before a federal court may evaluate the merits of a habeas corpus petition, the petitioner must have exhausted his remedies before the state court. *See Harrington v. Richter*, 131 S.Ct. 770, 787 (2011) (citing 28 U.S.C. § 2254(b)). This means that a defendant "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (describing Illinois' appellate procedures).

In addition, "'[a] habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim.'" *Malone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008) (quoting *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004)). Federal review also is precluded when the state court's decision rests on an adequate and independent state law ground, *see Promotor v. Pollard*, 628 F.3d 878, 885 (7th Cir. 2010), because where an independent state ground supports the judgment, a ruling on the federal claims would be advisory. *See Harrington*, 131 S.Ct. at 787; *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009) ("[W]hen a state refuses to adjudicate a petitioner's federal claims because they were not raised in accord with the state's procedural rules, that will normally qualify as an independent and adequate state ground for denying federal review.") (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

Procedurally defaulted claims will be evaluated, however, "if the petitioner can establish cause and prejudice for the default, or establish that the failure to consider the defaulted claim will result in a fundamental miscarriage of justice." *Promotor*, 628 F.3d at 885 (citing *Ward v. Jenkins*, 613 F.3d 692, 696 (7th Cir. 2010)). For claims that were not presented to the state court (and therefore did not receive an adjudication on the merits), a reviewing court may "dispose of the matter as law and justice require." *See* 28 U.S.C. § 2243; *Cheeks*, 571 F.3d at 684-85.

# III. ANALYSIS

## A. Gang-Related Evidence

Respondent argues that Parker's first claim—that he was denied due process by the prosecutor's attempt to elicit testimony regarding Parker's gang affiliation, argument that Parker was a coordinator in the gang, and argument that White was not credible as a result of her fear of gang retaliation—is procedurally defaulted because it was not fairly presented to the state courts. This court agrees.

In determining whether a claim was "fairly presented" to the state court, this court evaluates whether "the operative facts and the controlling legal principles of the federal claim [were] submitted to the state court through one complete round of state-court review." *Gonzales v. Mize*, 565 F.3d 373, 380 (7th Cir. 2009) (citing *Malone*, 538 F.3d at 753). In other words, "[a] 'hypertechnical congruence' of the claims is not required between federal and state court for a claim to be fairly presented; instead [the federal court looks to] whether the petitioner alerted the state court to the federal nature of his claim in a manner sufficient to allow that court to address the issue on a federal basis." *Crockett v. Hulick*, 542 F.3d 1183, 1192-93 (7th Cir. 2008) (citations and quotation marks omitted). The court analyzes four factors to determine whether an issue was "fairly presented": "1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional

litigation." *Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010) (internal quotation marks and citation omitted).

Respondent's first argument is that Parker defaulted by attempting to incorporate by reference the arguments from his appellate briefing into his PLA. The court finds this line of argument unpersuasive. In the first place, Parker was proceeding *pro se* at the time he filed his PLA, which means that his pleading must be interpreted liberally. *See Ward*, 613 F.3d at 697 ("In determining whether a claim has been fairly presented, we liberally construe pro se petitions."). But in any event, as Parker points out, he specifically highlighted the same two grounds for reversal in his PLA that he had previously presented to the appellate court. Although the bulk of the argument section was not contained in the PLA itself, the specifics of Parker's challenge were crystal clear without going beyond the "four corners of the document." *See Lockheart v. Hulick*, 443 F.3d 927, 929 (7th Cir. 2006). This, combined with the fact that Parker included the entirety of the appellate court opinion in his PLA, sufficed to fairly present those issues to the Illinois Supreme Court.

So had those issues been the same as the ones Parker seeks to present here (or at least close enough so that Parker "alerted the state court to the federal nature of his claim," *see Crockett*, 542 F.3d at 1192-93), this court would find that there was no procedural default. The problem is that Parker's claim has morphed from one rooted in the trial court's erroneous evidentiary ruling into one based on federal due process. The federal due process claim was not fairly presented.

In Parker's direct appeal, he was represented by counsel. His appellate brief framed the issue presented as an evidentiary issue:

> Evidence about the defendant's gang membership is not admissible at trial unless it is relevant to prove a matter at issue. The State's evidence showed this incident was not a gang-related crime but grew out of a dispute over the repair of a car. Over defense objection, the court allowed the prosecutor to present evidence on Parker's gang affiliation and to argue that the security guard who testified for Parker testified falsely because of gang intimidation. Did reversible error occur in the admission of this irrelevant gang evidence and in the prosecutor's unproved assumption that the defense witness lied due to gang pressure?

(Def.'s Br. at 2, Ex. E, ECF No. 87-5.) Not once in this brief did Parker cite any federal due process case, much less explicitly raise a due process claim. Instead, he repeatedly focused on the irrelevance of the gang evidence and claimed that he was prejudiced by its admission. He also argued that the trial court "abused its discretion" in admitting the evidence. (*Id.* at 13.) But while "[a]dmission of irrelevant and prejudicial evidence without a limiting instruction . . . is obviously an error, [ ] it is elementary that not every trial error rises to the level of a due process violation." *U.S. ex rel. Robinson v. Wilson*, No. 00 C 3598, 2001 WL 289884, at *6 (N.D. Ill. Mar.15, 2001).

As the Supreme Court noted in *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam), "If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." In *Duncan*, the Court held that the petitioner did not fairly apprise the state court of his claim "that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment," a conclusion which was bolstered by the fact that the state appellate court analyzed the evidentiary error "by asking whether its prejudicial effect outweighed its probative value, not whether it was so inflammatory as to prevent a fair trial." *Id.* The same is true here: the appellate court analyzed the issue as one rooted in evidentiary law and concluded that the trial court did

err by admitting the evidence, but went on to find that the error was harmless. *Parker*, 724 N.E.2d at 212. Moreover, Parker's emphasis on the trial court's abuse of discretion underscores the thrust of his argument: "'Abuse of discretion' and 'improper factors' are not terms that Illinois lawyers and judges, by quirk of local legal idiom, use to articulate constitutional arguments. To the contrary, abuse-of-discretion arguments are ubiquitous, and most often they have little or nothing to do with constitutional safeguards." *Harding v. Sternes*, 380 F.3d 1034, 1046-47 (7th Cir. 2004) (quoting *Wilson v. Briley*, 243 F.3d 325, 328 (7th Cir. 2001)) (internal quotation marks omitted); *see U.S. ex rel. Palinski v. Mathy*, No. 08 C 4581, 2009 WL 1515278, at *6 (N.D. Ill. May 28, 2009) ("When a petitioner raises an issue of state evidentiary law as a basis for a writ of habeas corpus, the petitioner has only exhausted state remedies if he presented the alleged evidentiary error as a constitutional violation; merely claiming an error under state evidentiary law is insufficient to give the state court a meaningful opportunity to rule on the substance of federal constitutional claims.").

Parker's strongest argument is that he did state he was denied a "fair trial" in his reply brief. Such passing references to constitutional issues do not suffice. *See Harding*, 380 F.3d at 1047 (where a petitioner included only an introductory sentence "making a passing reference to his right to present evidence and his right to a 'fair trial,'" the reference "was not sufficient 'to give the state courts a meaningful opportunity to pass upon the substance of the claims later presented in federal court'" since "[n]early every portion of his state court argument pointed to a state evidentiary issue") (quoting *Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001)). Although the operative

facts remain the same, Parker simply did not set out the federal nature of his claim in a manner that would allow the state courts to address the issue on a federal basis.

Because the due process claim was not fairly presented to the state courts, Parker cannot present his claim here unless he establishes cause and prejudice for the default, or that this court's failure to consider the defaulted claim would result in a fundamental miscarriage of justice. *See Promotor*, 628 F.3d at 885. Parker does not so argue, and so the court does not address the issue on the merits.

**B. Ineffective Assistance of Counsel**

Parker claims that he was denied his Sixth Amendment right to effective assistance of trial counsel for four reasons: (1) counsel did not interview Upshaw prior to trial, (2) counsel did not advise Parker that it was Parker's decision whether to testify and did not advise Parker of the "advantages of testifying," (3) counsel failed to meaningfully consult with Parker or to conduct an investigation; had he done so, he would have presented the defense that it was a man named Kevin Bennett, not Parker, who procured the M-80 and placed it into the trunk with Upshaw, and (4) counsel did not insist that the court "meaningfully" enforce the severance of the defendants' trials, so that Parker's co-defendants could testify and corroborate his story. Parker admits that these claims of ineffective assistance of counsel are procedurally defaulted, but argues that enforcing the default would result in a fundamental miscarriage of justice. Thus, he asks the court to either grant him his desired habeas relief or to hold a hearing so that he may present proof that he is entitled to relief.

There is no question that the claims are defaulted. Even assuming that Parker presented the claims in his initial post-conviction petition, he was represented by counsel

14

when he filed his appeal and subsequent PLA, and at both of those stages he focused entirely upon whether his sentence violated *Apprendi*. As a result, the court must determine whether there would be a fundamental miscarriage of justice if it declined to address the claims on their merits. Parker argues that his default should be excused based on a claim of actual innocence. His claim is one of procedural rather than substantive innocence, meaning "that his constitutional claim is not based on his innocence, but rather on his contention that the ineffectiveness of his counsel 'denied him the full panoply of protections afforded to criminal defendants by the Constitution.'" *Coleman v. Hardy*, 628 F.3d 314, 318-19 (7th Cir. 2010) (quoting *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995)). Therefore, Parker "must support the innocence claim 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Morales v. Johnson*, 659 F.3d 588, 605 (7th Cir. 2011) (quoting *Coleman*, 628 F.3d at 319).

The court undertakes a "holistic judgment" of all of the evidence to assess "how reasonable jurors would react to the overall, newly supplemented record"; the court also may make credibility determinations and evaluate the strength of the government's case. *House v. Bell*, 547 U.S. 518, 538-40 (2006) (citation and internal quotation marks omitted); *see Coleman*, 628 F.3d at 319. Of course, "absolute certainty about a petitioner's guilt or innocence is not required." *Coleman*, 628 F.3d at 319. Instead, Parker must show that in light of the new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. *Morales*, 659 F.3d at 605. This is a stronger showing than otherwise required to establish the prejudice

described in *Strickland v. Washington*, 466 U.S. 668 (1984). *Morales*, 659 F.3d at 605 (citing *House*, 547 U.S. at 571 (Roberts, C.J., concurring in part and dissenting in part)).

Parker attempts to present new evidence in support of his claim that he lacked the intent to kill Upshaw or to knowingly cause severe and permanent disability or disfigurement with a caustic or flammable device, as required for his convictions of attempted murder and heinous battery, respectively. In particular, he has submitted five affidavits: two from himself, and one each from Green, Young, and Upshaw, all of which are dated either from 2000 or 2009. (*See* Exs. R-V, ECF No. 87-6.) Although the information contained within those affidavits was available at the time of Parker's trial, he argues that the evidence was not presented due to his counsel's ineffectiveness. In the Seventh Circuit, that evidence will be considered "new" as long as it is reliable and was "genuinely not presented to the trier of fact." *Gomez v. Jaimet*, 350 F.3d 673, 679-80 (7th Cir. 2003) ("If procedurally defaulted ineffective assistance of counsel claims may be heard upon a showing of actual innocence, then it would defy reason to block review of actual innocence based on what could later amount to the counsel's constitutionally defective representation."); *cf. Kidd v. Norman*, 651 F.3d 947, 952 (8th Cir. 2011) ("Subsequent to *Schlup*, the circuits have disagreed upon what the Supreme Court meant by the 'new' part of 'new reliable evidence.' The Seventh and Ninth Circuits have interpreted this phrase to mean evidence is 'new' for purposes of a *Schlup* analysis so long as it was 'not presented' at trial. The Third Circuit agrees with ours that evidence is 'new' only if it was not available at the time of trial through the exercise of due diligence.").

Even though the court largely considers this to be "new" evidence, the affidavits do not assist Parker's claim. For instance, Young's affidavit simply states that Young was not at the scene of the crime and that he would have been willing to so testify "in a separate trial of Mr. Parker that took place after my trial." How this helps Parker is unclear; the affidavit is basically a self-serving statement that Young did not commit a crime, but does not shed any light on whether Parker did so.

Green's affidavit, from August 2000, states that "Ronard Parker had nothing to do with harming Mr. Wilbur Upshaw," and that "[t]he individual which did the farse [sic] play to the victim was Kevin Bennett." He provides no supporting detail whatsoever; moreover, the affidavit directly conflicts with Upshaw's testimony regarding the incident, which included, *inter alia*, Parker directing others to place Upshaw in the trunk of the car and to shoot at the trunk if Upshaw made any noise. Parker's affidavits attempt to place the blame on Kevin Bennett as well: in his 2000 affidavit, he says that "[w]hat actually happened was that Mr. Upshaw was horseplaying with Kevin Bennett and everything went out of hand," while in his 2009 affidavit he states that he told his counsel about Bennett's involvement and provided information about corroborating witnesses. But Parker never mentioned Bennett's name to the police, nor did he mention counsel's failure to investigate the theory when the issue was directly raised by the trial court:

*Defense Counsel:* Judge, I also want to spread of record just in case this comes to be an issue later; Mr. Parker has expressed to me his unhappiness of my representation of him. And he feels I'm being ineffective in the representation of him. So if at some point he seeks to assert that and spread of record at this point and time that is his feelings.

*The Court:* Why do you feel that way, sir? What are your reasons for that?

*Parker:* Because I've been sending messages trying to get in contact with him. And there are times where he failed to contact me. It's not

17

| | |
|---|---|
| | like he's getting the message. And I'm getting no response from him. |
| *The Court:* | Any other reasons? |
| *Parker*: | No. |
| *The Court:* | I find your accusation, your allegation is without merit. And have a seat with your attorney at counsel table and – |
| *Defense Counsel:* | Judge, I understand your position. However, I do want it to be clear that those are his feelings at this time. |

(Trial Tr. at 197:18-198:15, Ex. A, ECF No. 87-4.) In short, the court does not find these affidavits credible. *See House*, 547 U.S. at 552 (recounting Justice O'Connor's description of "eleventh-hour affidavit[s] vouching for a defendant and incriminating a conveniently absent suspect" as being "unfortunate" and "not uncommon," and noting that where the new evidence involves an "alleged spontaneous statement recounted by two eyewitnesses with no evident motive to lie" that evidence "has more probative value than, for example, incriminating testimony from inmates, suspects, or friends or relations of the accused") (citing *Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring)); *see also Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009) (rejecting affidavits by family members in part because they were prepared "years after the murder").

Finally, Parker relies heavily upon Upshaw's April 2009 affidavit, but that affidavit is not inconsistent with Upshaw's trial testimony. In the affidavit, Upshaw declares that "someone threw an M-80 into the car trunk in which I was locked," and that while Parker was in the parking lot, Upshaw "did not see [Parker] bring the M-80 to the parking lot or throw it into the trunk." He further recounts that after the explosion, he "turned around and saw that a bunch of guys were laughing," but that Parker was not one

of the people laughing. Thus, Upshaw states that he does not believe Parker threw the M-80 in the trunk or intended for another person to do so, "because he seemed shocked and concerned at the explosion and [Upshaw's] injuries."

Even under the expansive definition of "new" evidence in this circuit, the court does not think this affidavit qualifies. In fact, Parker's counsel expressly made these arguments to the court in his closing statement at trial:

> The other thing is from the testimony of Wilbur Upshaw it seems he's saying that Mr. Parker is there for part of the things and not there for other parts of things. And it's extraordinarily unclear that who in fact would have put whatever it was that caused his injuries to his hand into the car with him. Because he initially testifies that he's laying face down and he -- when he's laying face down, he's not sure if Mr. Parker is there or not, because he's not sure. Mr. Parker was not one of the people who allegedly walked him into the CHA building. So, there was a period of time when, as far as he's concerned, Mr. Parker has left. Well, there's no real clear indication that Mr. Parker is back at the time that he's put back into the car and this device is used on him.

(Trial Tr. at 293:12-294:3, Ex. A, ECF No. 87-4.) Moreover, Upshaw's subjective belief about something he could not see is not particularly persuasive, and could be discounted by a reasonable factfinder. *See Tate v. Pierson*, 177 F. Supp. 2d 792, 802 (N.D. Ill. 2001) (no miscarriage of justice where the petitioner attempted to rely upon an affidavit that was "ambiguous and would only show that [the affiant] did not see (or was not able to see) [the petitioner] running away from the shooting" and the petitioner's own conclusory statement that he was "one-hundred percent innocent of the crime"; affiant "would not be able to conclusively testify that [the petitioner] was not present," and the petitioner's present contentions merely raised the question of "whether he was the one that actually hit the victim with a fired shot, not whether he would still be guilty on an accountability theory").

19

As noted, the court considers all the evidence, old and new, and based on this total record, "make[s] a 'probabilistic determination about what reasonable, properly instructed jurors would do.'" *Morales*, 659 F.3d at 605 (quoting *Coleman*, 628 F.3d at 319). For the reasons stated above, these affidavits do little, if anything, to undermine the evidence presented at trial. The court sees no need for an evidentiary hearing. The court simply cannot say that in light of the new evidence, it is more likely than not that no reasonable factfinder would find Parker guilty beyond a reasonable doubt. *Morales*, 659 F.3d at 605; *Coleman*, 628 F.3d at 319-20 (discussing evidentiary hearings for actual innocence claims).

## IV. CONCLUSION

For the reasons set forth above, Parker's petition for a writ of habeas corpus is denied.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 5, 2012